Mr. Chief Justice Sharkey
delivered the opinion of the court.
The appellee, Thornton, filed this bill in the vice-chancery court, to remove a cloud or incumbrance from his title to a section of land. Both the appellee and appellant claim title under execution sales. Both judgment liens accrued on the'5th of August, 1839, by the forfeiture of forthcoming bonds, but the complainant is the prior purchaser, and therefore seeks to get rid of the title acquired by Boyd under the last sale. Boyd also has a title to the laud from McNeill, the defendant in execution, but the land was subject to the judgment liens when he purchased.
It seems, by the bill and proof, that complainant acquired, by assignment, a judgment against McNeill, in favor of Howell & McKendree, rendered in March, 1839, on which McNeill gave *341 the forthcoming bond that was forfeited in August, 1S39. This assignment was made in 1843.
The defence relied on is, that Thornton purchased the judgment for McNeill, the judgment debtor, and held and used it for his benefit, to defraud creditors. If this be so, the relief ought not to be given. It is a question which depends very much on the weight of evidence, and we must, of course, feel great reluctance in deciding it, inasmuch as we must entertain more or less distrust as to the correctness of our conclusion. The substance of the material parts of the testimony will be briefly stated.
R. H. Byrne, a witness for complainant, states that he transferred the judgment to complainant. He received nothing therefor but what he received of complainant, and knew nothing of McNeill in the transaction. He.received of complainant, in part payment, two notes of $600. It is proper to remark that Byrne held this judgment by assignment from Howell & McKendree.
Rolles, a witness for complainant, proves the cultivation of part of the land by complainant in 1844, and that he rented out part of it in 1845 and 1846. Boyd also took possession of part of the land in 1845.
Daniel McNeill was also introduced as a witness for the complainant. He was the execution debtor, and the same individual who had previously sold the land to Boyd. He states that, in 1843, Boyd expressed a wish to get clear of the note given to the witness for the land, which was then held by the Northern Bank of Mississippi, and that he had been advised to let the land be sold under the execution against McNeill, so that he might set' up such sale as a defence against the note; that he had agreed if complainant, Thornton, would purchase the judgment, and buy section two under it, he (Boyd) would release his right of redemption, and, in order to induce the witness to join him in such release, he agreed to give him a discharge from his warranty contained in his deed formerly made to Boyd, which the witness assented to, and the release was given. Boyd also told the witness he had agreed to make an *342 exchange with Thornton, by giving him another section of land for section two. The witness also states that the judgment under which Thornton purchased had not been paid off; that Thornton did not purchase the judgment with his (witness’s) money, or for his benefit. He states that Boyd seemed to be willing to lose the section of land, if he could get clear of the debt to the Northern Bank. The witness always assured Boyd that he would make the title good, and would have done so, but for Boyd’s desire that the land should be sold, and the discharge from his covenants which Boyd had given him, that he was not to be responsible to the complainant for the money paid by him for the judgment, except as a judgment debtor.
Wall, another witness for complainant, was present when Boyd and McNeill released to complainant their right to redeem the land. He supposed the contract had been made before he met the parties, and heard no other terms than those expressed in the contract itself. Much was said about Boyd’s debt to the Northern Bank, and it was supposed he could get clear of it if the land should be sold. It seems that this agreement to relinquish the right to redeem was made some time before the sale took place.
Thomas Wall heard Boyd say he could buy the judgment, but would not, as he could get clear of paying for the land, if it should be sold.
W. F. Mason, a witness for the defendant Boyd, states that the two notes for $600 each, given, by Thornton to Byrne for the judgment, were assigned to him. He had some conversation with Thornton before the transfer; but, after the transfer, both Thornton and McNeill told the witness that McNeill was to pay the notes. The witness made a contract with McNeill for the purchase of a, mill, in which McNeill agreed to take up these notes in part payment; but when the parties came to settle, the witness had other claims sufficient, and the' notes were not given up to McNeill.' He brought suit on the notes, and Thornton said they had been given for McNeill’s benefit, and he was to pay them. The suit was continued at one term *343 by the affidavit of Thornton, who stated therein that he expected to prove by McNeill that he (McNeill) had paid the notes. Within the last two years, McNeill had said, on several occasions, that there was a chancery suit against Boyd for the land sold by him to Boyd, tvhich no doubt he (Boyd) would lose, and he (McNeill) was to have the benefit of the land, and would let it go towards his debts. The witness further stated, that after Thornton had given a forthcoming bond on the judgment recovered on the notes, he failed to pay the amount to the sheriff who had indulged him; and on being pressed to pay by the witness, he again stated that the notes were given for McNeill’s benefit, who was to pay the debt. Before the witness brought suit, he informed Thornton, on one occasion, that McNeill had not taken up the notes under their contract. Thornton spoke with warmth and expressed surprise, and said he was glad the witness had told him, as he should otherwise have given up some indemnities he then held.
The contract between Mason and McNeill for the mill is set out, and contains the agreement referred to in reference to the notes.
Pool, another witness for Boyd, heard a conversation between Thornton and appellant, and understood the agreement to be that Boyd was to be released from the Northern Bank debt, and Thornton was to purchase the land under the execution. This occurred in 1S43.
As rebutting evidence, a bill in chancery is introduced, by which Boyd prayed' an injunction to restrain the collection of the note held by the bank, on the ground that the land which was the consideration had been purchased by Thornton under execution, and that the consideration had failed. The injunction, however, was dissolved on motion. On this evidence it is next to impossible to resist the conclusion that McNeill was really the party to be benefited by the purchase of the judgment. The great variety of circumstances detailed by Mason seem to be decisive on this head. The two important witnesses are McNeill and Mason. The former is the party to the fraud, if there be one. He is said to be the beneficiary of the scheme. *344 His attitude is calculated to excite suspicion. On the other hand, Mason could have had no interest in the transaction ; there could have been no motive with him for giving even a coloring to the transaction unwarranted by the facts. There is a direct conflict between the two witnesses, not perhaps as regards the single statement as to the bona fi&es of the transfer of the judgment; that Mason did not speak of; but he detailed circumstances which, if true, disprove McNeill’s statement as being wholly inconsistent with it. Either Mason did not state the truth, or both Thornton and McNeill had repeatedly stated to him that the notes were given for the benefit of McNeill; that he in truth was to pay them, and looked upon as the real debtor. Not only so, but it would seem from Thornton’s own statement that he had received and held an indemnity against his liability. Thornton even swore, on one occasion, that he believed McNeill had paid the debt; and at another he expressed surprise, in an angry tone, that McNeill had not paid. Besides, McNeill actually contracted to lift the notes, and has even stated that he is to reap the benefit of this suit. All these facts are wholly inconsistent with the declaration by McNeill, that Thornton did not purchase the judgment with his money, or for his benefit. To say the least, therefore, the complainant comes 'into a court of chancery not entirely free from suspicion, and the question is whether, under such circumstances, he is entitled to relief in the matter of the bill.
The statute is very broad, and seems to authorize the true owner in all cases to apply to a court of chancery for its assistance against any one who may have a deed, or other evidence of title, which may form a cloud, or in any tvay cast a shadow of doubt or suspicion on the title of the owner. Hutch. Code, 773. In terms it may seem to confer power on the court of chancery to try the strength of title in all cases, and thus to dispense with the well-known remedy at law by action of ejectment. For the present we shall not criticise the power of the legislature in this respect. In making an application of the statute, however, we must keep in view certain established principles which prevail in the administration of equity jurisprudence, and *345 hold that they are not abolished by the statute. It is a settled maxim, that a court of chancery will never assist a wrong-doer in effectuating his wrongful and illegal purpose. 1 Story, 77. It is even said, that, if a party come into a court of equity contaminated with fraud, he shall not have that which is really due to him, because he has committed• an iniquity.- 1 Fonbl. 140. One of the great objects of chancery jurisdiction is the detection of fraud, and the remedy it gives to the injured party. In no case can the court be made the instrument by which a fraud is perpetrated, or an injury inflicted. The party who comes into equity must do equity. If the fraud be apparent, as a matter of course relief will be refused; and if there be a well-grounded suspicion that the party has been guilty of fraud, or is seeking an unconscientious advantage, the court ought not to entertain the case. It was held in the cáse of Banks v. Evans, 10 S. & M. 35, that “ he who comes into equity to get rid of a legal title, which is alleged to overshadow his own, must show clearly the validity of his own title, and the invalidity of his opponent’s. He cannot expect a court of equity to set aside a legal title upon a doubtful state of case.” Here, then, certainly, is a doubtful state of case. We cannot feel satisfied with the entire fairness and validity of the complainant’s title. There is no necessity for the relief prayed for. Boyd is in possession, and may be sued at law, where the remedy is both ample and free from doubt. We do not mean to decide against the validity of the complainant’s title. All we mean to say is, that he does not present himself in such an attitude as to be entitled to relief in equity, and we are wholly at a loss to perceive the reason for selecting the chancery court as the proper, one to give relief in this case. We cannot consent to employ the powers of chancery in removing impediments or clouds to title, where the title relied on is itself of a questionable character. The party who comes in for that purpose, must come prepared to sustain the entire fairness of his own title; and if he fail in doing so, the condition of the defendant must be the best.
The decree must be reversed, and the bill dismissed without prejudice.